IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STRUCTURAL PRESERVATION     *
SYSTEMS, LLC, et al.
             Plaintiffs     *

       vs.             *    CIVIL ACTION NO. MJG-12-1850

JAMES L. ANDREWS, et al.     *

           Defendants     *

*    *    *    *    *    *    *    *    *

<u>MEMORANDUM AND ORDER RE: MOTIONS TO DISMISS AMENDED COMPLAINT</u>

The Court has before it Defendants Sean Turner's and Benjamin Ball's Motion to Dismiss Amended Complaint for Failure to State a Claim [Document 52], Defendant James Andrews' Motion to Dismiss for Failure to State a Claim and/or, Alternatively, to Transfer Under Forum Non Conveniens [Document 57], and the materials submitted related thereto. The Court has had a hearing and had the benefit of the arguments of counsel.


I.   <u>BACKGROUND</u>[1]

Plaintiff Structural Preservation Systems, LLC ("SPS"), based in Hanover, Maryland, is a specialty contractor that provides construction and engineering services in the commercial, government, industrial, energy, and transportation markets. Specifically, SPS performs floor tipping restoration

---

[1]   The "facts" are stated herein as alleged by Plaintiffs and not agreed upon in various respects by Defendants.

and vault work.  Plaintiff Structural Group, Inc. ("SGI"), based in Baltimore, Maryland, is the general manager of SPS. Defendants Sean Turner ("Turner"), Benjamin Ball ("Ball"), and James Andrews ("Andrews") (collectively, the "Defendants") are former employees of SPS.

In 2006 and 2007, SPS entered into employment agreements with the Defendants that contain forum-selection clauses, confidentiality provisions, and, for Andrews only, a non-disparagement provision.  Following the conclusion of the Defendants' employment with SPS in 2010 and 2011, the Defendants started a new business venture in California, Turner & Sons, that competes with SPS for floor tipping restoration and vault work.  Plaintiffs allege that the Defendants have misappropriated SPS's valuable and confidential proprietary business information and/or trade secrets in connection with Turner & Sons, which enabled Turner & Sons to undercut SPS's bids on two construction projects.

In addition, Plaintiffs claim that after the conclusion of his employment with SPS, Andrews told persons - including current employees of SPS - that SPS is engaged in a bid-rigging scheme, raided other corporate entities, and engaged in racism and discrimination against employees.

II.  <u>PROCEDURAL BACKGROUND</u>

On June 22, 2012, Plaintiffs filed the Complaint [Document 1].  In the Memorandum and Order Re: Motions to Dismiss [Document 43] the Court held that it could exercise personal jurisdiction over the Defendants and that venue in the District of Maryland is proper and dismissed, without prejudice to the filing of an Amended Complaint, all claims against Andrews.

On April 1, 2013, SPS and SGI (collectively "Plaintiffs") filed the Amended Complaint [Document 49] presenting claims in four Counts:

| | |
|---|---|
| Count I | Breach of Contract (All Defendants), |
| Count II | Violation of Maryland Uniform Trade Secrets Act (All Defendants), |
| Count III | Breach of Contract (Defendant Andrews), and |
| Count IV | Declaratory Judgment (Defendant Andrews) |

By the instant motions, each Defendant seeks dismissal of all claims in the Amended Complaint against him pursuant to Rule 12(b)(6).[2]  In addition, Andrews sought alternatively to transfer this case under forum non conveniens to the Central District of California.[3]

---

[2]    All Rule references herein are to the Federal Rules of Civil Procedures unless otherwise indicated.
[3]    Defendants Turner and Ball, who filed a dismissal motion

III. <u>DISMISSAL STANDARD</u>

A motion to dismiss filed pursuant to Rule 12(b)(6) tests the legal sufficiency of a complaint. A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (citations omitted). When evaluating a 12(b)(6) motion to dismiss, a plaintiff's well-pleaded allegations are accepted as true and the complaint is viewed in the light most favorable to the plaintiff. However, conclusory statements or a "formulaic recitation of the elements of a cause of action" will not suffice. <u>Id.</u> A complaint must allege sufficient facts to "cross 'the line between possibility and plausibility of entitlement to relief.'" <u>Francis v. Giacomelli</u>, 588 F.3d 186, 193 (4th Cir. 2009) (quoting <u>Twombly</u>, 550 U.S. at 557).

Inquiry into whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Id.</u> Thus, if the well-pleaded facts contained within a complaint "do not

---

jointly, also requested transfer of this case to the Central District of California on the grounds that the forum-selection clause in Turner's employment agreement was the product of overreaching. After Turner and Ball filed their dismissal motion, the Court found the forum-selection clause in Turner's employment agreement to be enforceable [Document 65].

permit the court to infer more than the mere possibility of
misconduct, the complaint has alleged – but it has not shown –
that the pleader is entitled to relief." Id. (quoting Ashcroft
v. Iqbal, 556 U.S. 662, 679 (2009)) (internal quotation marks
omitted).


IV.  DISCUSSION

    A.  Misappropriation Claims (Counts I and II)

    Plaintiffs allege that, as part of their employment with
SPS, the Defendants were given access to valuable and
confidential proprietary information related to SPS's client
lists, client preferences, pricing models, estimating and mark-
up strategies, and customized tools to price jobs and create
bids, etc.  Am. Compl. [Document 49] ¶¶ 34, 36.  This
information (collectively referred to as "the Proprietary
Information") includes:

> • Information contained in the Customer
>   Relationship Management Program ("CRM") – a
>   password protected program purchased by SPS that
>   maintains a customer relationship database
>   including information on current clients,
>   potential clients, client needs, and work
>   performed for clients;[4]
>
> • Pricing Tools – computerized program that houses
>   customized tools developed by SPS to price jobs,
>   create estimates and mark-ups, and formulate bids
>   for clients and potential clients.  Each screen

---

[4]     Only Turner and Andrews are alleged to have had access to
the CRM while employed with SPS.  Am. Compl. ¶ 38.

of the Pricing Tools program is marked
"Confidential";

- The Template – an "estimating template" developed
  by and unique to SPS that is used to create bids
  for projects, provides SPS with an "economic
  advantage over competitors in the marketplace",
  and contains bid calculation methods particular
  to SPS. The Template is standardized based on
  the type of project (i.e., floor-tipping or vault
  projects);

- Project Tools – customized tools for forecasting
  jobs, production, check lists, safety, etc.,
  which are accessible only on SPS's intranet; and

- Procedural Guides – step-by-step procedural
  guides unique to SPS, such as an 18-step
  Procedural Guide for floor tipping projects.
  Each page of the Procedural Guides is marked
  "Confidential".

Id. ¶¶ 37-53.


Plaintiffs allege that SPS maintained procedures to protect

the Proprietary Information from disclosure to competitors,

including employee acknowledgements when entering SPS's intranet

that all information contained on that network is confidential,

confidentiality provisions in employment agreements,

confidentiality provisions in all bids, and limiting access to

certain of the Proprietary Information by job description. Id.

¶¶ 56-57.

Plaintiffs allege that the Proprietary Information are

protected as confidential information under the Defendants'

employment agreements and constitute trade secrets under the
MUTSA.

## 2.   Contract Rights Enforceability

The Defendants contend that Count I is subject to dismissal
because the Confidentiality Provisions in their respective
employment agreements are unenforceable under California or
Maryland law as de facto non-compete clauses or unreasonable
restraints on trade.  Thus, they contend, Plaintiffs can protect
any Proprietary Information that constitutes a statutory trade
secret only by their MUTSA claim (Count II) and cannot, by
asserting contract rights, protect any Proprietary Information
that is not a statutory trade secret.

### a.   The Confidentiality Provisions

Turner and Ball signed identical employment agreements with
SPS stating:

> 2.   [SPS][5]  places  a  high  value  on
> maintaining the confidentiality and value of
> its  trade  secrets.   The  phrase  "trade
> secrets" means any company confidential or
> proprietary  information  of  or  relating  to
> [SPS], or the business prospects or affairs
> of [SPS], including but not limited to,
> financial   data,   pricing   and   bidding

---

[5]    Turner's employment agreement is with "Structural
Preservation Systems, LLC, and all of its subsidiaries and
affiliates" and Ball's employment agreement is with "Structural
Group, Inc. and all of its subsidiaries and affiliates."

> information, marketing and sales
> information, customer lists and information,
> business know-how, means and methods,
> products, processes and procedures, designs,
> and training programs within the company
> knowledge management system. . . .

Am. Compl. Ex. 2, 3 [Documents 49-3, 49-4] ¶ 2. Turner's and
Ball's employment agreements provide that they agree "not to use
(other than for the exclusive benefit of [SPS]) or disclose to
any person, firm, or corporation . . . the trade secrets or
other information of or pertaining to [SPS]. This non-
disclosure agreement does not apply to information of [SPS]
which is generally available to the public through no actions of
the EMPLOYEE."[6] Id. ¶ 3(a).

Andrews signed an employment agreement with SPS that
contained a confidentiality provision stating that Andrews
would:

> . . . [K]eep confidential and will not
> disclose to anyone . . . or publish, utter,
> exploit or make use of (or aid others in
> publishing, uttering, exploiting or using),
> or otherwise Misappropriate . . . any Trade
> Secrets or Confidential or Proprietary
> Information at any time. Andrews's
> obligations hereunder shall continue both
> during and after the Term hereof for so long
> as such Trade Secrets or Confidential or
> Proprietary Information remain Trade Secrets
> or Confidential or Proprietary Information
> of the Company.

---

[6] Turner's and Ball's employment agreements do not contain
choice-of-law provisions.

Am. Compl. Ex. 1 [Document 49-2] ¶ 7(a)(1).  "Trade Secrets or

Confidential or Proprietary Information" is defined as

information that would be considered a "trade secret" under the

MUTSA[7] <u>and</u> information that is "unique to [SPS] which has a

significant business purpose and is not known or generally

available from sources outside [SPS] or typical of industry

practice" or "the disclosure of which would have a material

adverse effect on the business of [SPS]."  <u>Id.</u> ¶ 7(c)(4)(i) &

(ii)(emphasis added).


        b.   <u>Enforceability</u>

     Defendants contend that the Confidentiality Provisions are

unenforceable as de facto non-compete clauses or unreasonable

restraints on trade to the extent such provisions are broader

than the MUTSA or any other applicable trade secrets law.  The

Defendants also maintain that despite the principles of <u>lex loci</u>

<u>contractus</u> (under which Turner and Ball admit Maryland law most

likely controls)[8] and the Maryland choice-of-law provision in

_____

[7]    The Andrews' agreement provides that "all Trade Secrets or
Confidential or Proprietary Information shall be 'Trade Secrets'
(as defined under the [MUTSA], which definition is set forth in
Section 7(c)(4)(i) hereof)."  Am. Compl. Ex. 1 [Document 49-2]
¶ 7(a)(2)(i).
[8]    Turner and Ball assert that Maryland recognizes a "public
policy" exception to <u>lex loci contractus</u> that would permit the
Court to apply California law over Maryland law.  The Maryland
Court of Appeals has recognized that it will not apply the <u>lex
loci</u> principles in a contract action to the extent those

9

Andrews' employment agreement, California law should control the enforceability of the Confidentiality Provisions because California has a strong public policy against restrictive covenants.

The Proprietary Information that Plaintiffs seek to protect appears, at least potentially, to include information that would not constitute a MUTSA trade secret.  Whether applying Maryland or California law, questions arise as to the enforceability of the Confidentiality Provisions by virtue of their having wider breadth than the MUTSA.  See generally Metro Traffic Control, Inc. v. Shadow Traffic Network, 27 Cal.Rptr.2d 573, 577 (App. Ct. 1994) (affirming denial of preliminary injunction and explaining California law permits restraints in employment agreements that are "necessary to protect the employer's trade secrets"); Allied N. Am. Ins. Brokerage Corp. of Cal. v. Woodruff-Sawyer, 2005 WL 6583937, at *8 (N.D. Cal. Feb.22, 2005) (noting, in context of preliminary injunction motion, that post-employment non-solicitation agreements protecting a former employer's "confidential, proprietary, and/or trade secret"

---

principles require the enforcement of another state's law and there is a "strong public policy" against enforcement of that law in Maryland. See Lab. Corp. of Am. v. Hood, 911 A.2d 841, 848 (2006) (citing Bethlehem Steel Corp. v. G.C. Zarnas & Co., Inc., 498 A.2d 605, 608 (Md. 1985)).  The Court does not now reach the issue but observes that the rationale of the Hood and Bethlehem Steel decisions may not be applicable to the instant case.

information do not run afoul of Section 16600[9]); <u>Fowler v. Printers II, Inc.</u>, 598 A.2d 794, 799 (Md. Ct. Spec. App. 1991) (explaining that an employer can enforce restrictive covenants to prevent the misuse of trade secrets, routes, or lists of clients or solicitation of customers).  Moreover, there may be issues presented regarding whether, as to the Proprietary Information that is a MUTSA trade secret, a contract claim is duplicative or preempted.

The issues surrounding the applicability of California law on public policy grounds and the enforceability of the Confidentiality Provisions, which are heavily intertwined, present substantial factual questions.  See <u>Ruhl v. F.A. Bartlett Tree Expert Co.</u>, 225 A.2d 288, 291 (Md. 1967) (explaining that when determining whether a restrictive covenant in an employment contract is enforceable, courts assess "whether the particular restraint is reasonable on the specific facts"); <u>Ecology Servs., Inc. v. Clym Envtl. Servs., LLC</u>, 952 A.2d 999, 1007 (Md. Ct. Spec. App. 2008).

Accordingly, the Amended Complaint is not subject to dismissal on enforceability grounds.

---

[9]    California Business and Professions Code § 16600 provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

### 3.  Preemption

Defendants Turner and Ball contend that Count I is subject to dismissal as preempted by the MUTSA

Subject to certain exceptions, the MUTSA provides the exclusive civil remedy for the misappropriation of a trade secret.  See Md. Code Ann., Com. Law § 11-1207; Bond v. PolyCycle, Inc., 732 A.2d 970, 976 n.2 (Md. Ct. Spec. App. 1999).  However, as discussed above, Count I includes claims based on Proprietary Information that is not a MUTSA trade secret.  Hence, there are at least some claims in Count I that are not preempted by the MUTSA.  See Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc., 190 F. Supp. 2d 785, 802 (D. Md. 2002) (concluding breach of confidential relation claim not subject to dismissal as preempted by MUTSA where a plaintiff may plead in the alternative that if misappropriated information was not trade secret, the defendant breached the duty of confidentiality).

Accordingly, Count I is not subject to dismissal on preemption grounds.

### 4.  Adequacy of the Factual Allegations

The Defendants assert that the factual allegations in the Amended Complaint fail to provide enough detail to support a

plausible claim that the Proprietary Information are trade

secrets or that the Defendants misappropriated such information

in violation of the Confidentiality Provisions and/or the MUTSA.


a.   "Trade Secrets"

The MUTSA defines a trade secret as:

> [I]nformation, including a formula, pattern,
> compilation, program, device, method,
> technique, or process, that:
>
> (1) Derives independent economic value,
> actual or potential, from not being
> generally known to, and not being readily
> ascertainable by proper means by, other
> persons who can obtain economic value from
> its disclosure or use; and
>
> (2) Is the subject of efforts that are
> reasonable under the circumstances to
> maintain its secrecy.

Md. Code Ann., Com. Law § 11-1201(e).

"The existence of a trade secret is a conclusion of law

based upon the applicable facts." Trandes Corp. v. Guy F.

Atkinson Co., 996 F.2d 655, 661 (4th Cir. 1993). The

Restatement of Torts sets forth six factors relevant to

determining whether given information constitutes a trade

secret:

> (1) the extent to which the information is
> known outside of his business; (2) the
> extent to which it is known by employees and
> others involved in his business; (3) the
> extent of measures taken by him to guard the

13

> secrecy of the information; (4) the value of
> the information to him and to his
> competitors; (5) the amount of effort or
> money expended by him in developing the
> information; (6) the ease or difficulty with
> which the information could be properly
> acquired or duplicated by others.

Id. (quoting Restatement (First) of Torts § 757 cmt. b.).

Maryland courts consider the Restatement factors to provide

"helpful guidance to determine whether the information in a

given case constitutes 'trade secrets' within the definition of

[MUTSA]." Optic Graphics, Inc. v. Agee, 591 A.2d 578, 585 (Md.

Ct. Spec. App. 1991).

The Defendants argue that the Amended Complaint is

deficient because it does not allege that the Proprietary

Information is "not generally known" in the flooring and

vaulting fields or "not readily ascertainable by proper means."

Defendants are correct that the Amended Complaint does not use

that conclusory phraseology, simply reciting the statutory

language. However, the Amended Complaint contains allegations

that, inter alia, the information in the CRM includes password

protected confidential client lists that are valuable to SPS;

the Pricing Tools are confidential and valuable to SPS, the

Templates (developed by and unique to SPS) are confidential and

give SPS economic advantage over competitors in the marketplace;

the Project Tools are customized by SPS, confidential, and

valuable to SPS; and the Procedural Guides contain valuable and

14

confidential information that gives SPS a competitive advantage in the marketplace. Am. Compl. ¶ 34-52. A client list is capable of constituting a trade secret where the list is protected from public disclosure and the list is competitively valuable. See NaturaLawn of Am., Inc. v. W. Grp., LLC, 484 F. Supp. 2d 392, 399 (D. Md. 2007).

Drawing all reasonable inferences in favor of Plaintiffs, the Court concludes that the Amended Complaint contains factual detail sufficient to support a plausible claim that the Proprietary Information are "trade secrets" within the meaning of the MUTSA.


b.  Misappropriation

Defendants assert that the Plaintiffs' claims of misappropriation are too speculative because the Plaintiffs failed to allege which Defendants misappropriated or used which trade secret and/or how the Defendants misappropriated information allegedly stored on SPS's intranet post-employment.

Under the MUTSA, "misappropriation" means the "[d]isclosure or use of a trade secret of another without express or implied consent" by a person who "used improper means to acquire knowledge of the trade secret" or at the time of disclosure or use, "knew or had reason to know that the person's knowledge of the trade secret was":

> (1) Derived from or through a person who had
> utilized improper means to acquire it;
>
> (2) Acquired under circumstances giving rise
> to a duty to maintain its secrecy or limit
> its use; or
>
> (3) Derived from or through a person who
> owed a duty to the person seeking relief to
> maintain its secrecy or limit its use.

Md. Code Ann., Com. Law § 11-1201(c). Likewise, the Confidentiality Provisions prohibit the Defendants from using or disclosing information protected thereby.

The Amended Complaint contains allegations that all of the Defendants are part of a business venture called "Turner & Sons" or "American Restore" that "directly competes with [SPS] in . . . tipping floor work and vault work." Am. Compl. ¶ 65 & n.1. Plaintiffs allege that as part of that business venture, the Defendants have used or disclosed the Proprietary Information gained from their employment with SPS to usurp SPS's business opportunities. Specifically, Plaintiffs and the Defendants – though Turner & Sons – submitted bids for two tipping floor repair/restoration jobs. Plaintiffs aver that the Defendants used or disclosed the Proprietary Information to determine the margin needed to slightly undercut SPS and win the bids and, but for the Defendants' misappropriation, SPS would have won both of those projects. Id. ¶ 70-74.

Assuming the veracity of the these allegations and drawing all reasonable inferences in favor of Plaintiffs, the Amended Complaint presents a plausible claim that the Defendants used or disclosed the Proprietary Information in connection with Turner & Sons, a business all of the Defendants are involved in and that competes with SPS, by utilizing that Information to predict how SPS would formulate its bid and then undercut it. Hence, the Amended Complaint is not deficient because it fails to elucidate which Defendant used or disclosed which trade secret. Nor are the claims of misappropriation illogical because the Plaintiffs do not explicitly aver the means by which the Defendants acquired the Proprietary Information – most of which is stored on SPS's intranet – post employment. It would be reasonable to draw the inference from the Amended Complaint that the Defendants had knowledge of the Proprietary Information from using it during their employment and/or fixated it onto a transferable medium prior to the conclusion of their employment with SPS.

Accordingly, the Amended Complaint is not subject to dismissal for failure to allege a plausible claim that the Defendants misappropriated the Proprietary Information.

## c.  Inevitable Disclosure

Andrews appears to take the position that Count II is subject to dismissal because the California Uniform Trade Secrets Act is controlling and California rejects the inevitable disclosure rule.[10]  The Maryland Court of Appeals has expressed concern about the doctrine of inevitable disclosure and does not appear to have ever applied or adopted it.  See LeJeune v. Coin Acceptors, Inc., 849 A.2d 451, 470-71 (Md. 2004).

As summarized by the Maryland Court of Appeals, the "theory of 'inevitable disclosure' has been applied . . . to enjoin a departing employee from working for a competitor when the court is persuaded that it is inevitable that the departed employee will use or disclose trade secrets in his or her work for the competitor."  Id. (finding California case law persuasive in denying injunctive relief on the basis of  an "inevitable disclosure" theory and noting "Maryland has a policy in favor of employee mobility similar to that of California").

In the briefing on the instant motions, Plaintiffs have made clear that they do not seek recovery on a theory of inevitable disclosure or a threat to misappropriate trade secrets.  Rather, Plaintiffs seek relief under the MUTSA for the Defendants' actual misuse of the Propriety Information.

---

[10]  The Court will not now decide whether California or Maryland law controls Plaintiffs' trade secrets' claim as it appears to make no meaningful difference at this juncture.

Accordingly, the inevitable disclosure contention is not a basis for dismissal.

B.    <u>The Non-Disparagement Claim (Count III)</u>

In the Memorandum and Order Re: Motions to Dismiss [Document 43], the Court dismissed the Non-Disparagement Claim against Andrews because SPS did "not allege the particular nature of the remarks or to whom or when such remarks were made."  In the Amended Complaint the Plaintiffs seek to rely upon two instances of alleged disparaging remarks made by Andrews:

> (1)    A letter sent by Andrews to Plaintiffs' President Peter Emmons (the "Andrews Letter")[11] in which Andrews, as an apparent proposal to engage in settlement negotiations, suggests a confidentiality agreement including information related to, <u>inter</u> <u>alia</u>, SPS's "racism & discrimination issues" and "bid-rigging" and
>
> (2)    A May 2012 phone conversation between Andrews and Bill Blennerhassett ("Blennerhassett"), a SPS employee during which Andrews said someone from SPS forged his signature as part of a bid-rigging scheme and has and/or will go to the FBI with such information.

---

[11]    The Andrews Letter is attached to the Amended Complaint. The Amended Complaint contains allegations that Emmons received the letter on or about June 7, 2012.

Andrews asserts that the claimed disparaging remarks are not actionable because they were made to SPS employees and/or are legally protected.

The "Non-Disparagement Provision" in Andrews' employment agreement provides that, for two years following the date Andrews ceases to be an employee of SPS, Andrews:

> . . . [W]ill not, <u>directly or indirectly</u> . . . make any disparaging remarks about the business, services, products, stockholders, officers, directors or other personnel of [SPS] or any of its Affiliates, or interfere in any way with the Company's business.

Am. Compl. Ex. 1 [Document 49] ¶ 7(b)(5) (emphasis added).


## 1. <u>Recipients of Remarks</u>

The Non-Disparagement Provision does not state whether actionable remarks include only those made to persons who are not associated with SPS. Plaintiffs contend that disparaging remarks made to their employees by former employees are just as damaging as disparaging remarks made to third parties because such statements can lower employee morale, foster unrest amongst current employees, etc.

The Non-Disparagement Provision is ambiguous as to its recipient coverage and requires contract interpretation. The Plaintiffs' reading of the Provision is at least plausible. Thus, the issue cannot be resolved for Defendants in the instant

context.  See generally Martin Marietta Corp. v. Int'l
Telecomms. Satellite Org., 991 F.2d 94, 97 (4th Cir. 1992).


## 2.  Privileged Settlement Communication

Andrews contends that the Andrews Letter is a settlement
communication and is therefore protected by the litigation
privilege against suit.  The Andrews Letter is marked
"confidential and privileged", appears to be composed on
Andrews' letterhead and signed by Andrews, makes reference to
meeting with Emmons "to further attempt to work out our issues
and a fair and reasonable settlement package for myself", and
explains that Andrews has "met with several law firms."

The Federal Rules of Evidence restrict the admissibility of
statements "made during compromise negotiations about [a]
claim."  Fed. R. Evid. 408.  From the face of the Amended
Complaint and the Andrews Letter, it is unclear what "issues"
Andrews sought to workout with Emmons and/or whether Andrews
wrote the letter with or without the assistance of counsel.[12]

---

[12]    Maryland recognizes a litigation privilege for defamatory
statements published by an attorney prior to the "institution of
a judicial proceeding which is contemplated in good faith" as
well as communications in the institution, of, or during the
course and as a part of a judicial proceeding.  See Arundel
Corp. v. Green, 540 A.2d 815, 818-19 (Md. Ct. Spec. App. 1988).
The Court does not reach the question whether this privilege
would be at all applicable to the Andrews Letter.

With reference to the Amended Complaint and the Andrews
Letter attached thereto, the Court cannot conclude that
Plaintiffs have no plausible position to refute Andrews'
privilege-related defense.


3.  The Blennerhassett Call

Andrews maintains that any attempt to enforce the Non-
Disparagement Provision in regard to this telephone call is
against public policy because it would "prevent Andrews from
voluntarily approaching a government or law enforcement agency
or to petition a Court to report a violation of law."  Andrews'
Mot.[Document 57] at 16.

Under Maryland law, "'parties are free to contract as they
wish. A contractual provision that violates public policy is
invalid, but only to the extent of the conflict between the
stated public policy and the contractual provision.'"  Wilson v.
Nationwide Mut. Ins. Co., 910 A.2d 1122, 1131 (Md. 2006)
(quoting State Farm Mut. Auto. Ins. Co. v. Nationwide Mut. Ins.
Co., 516 A.2d 586, 592 (Md. 1986)).

The allegations in the Amended Complaint do not establish
the public policy defense presented by Andrews.  Amend Compl. ¶
¶ 86-88.  The "actionable" telephone call alleged was to a SPS
employee and not a government agent.  Moreover, the call

included more disparagement than reference to Andrews' calls to the FBI, *i.e.*, reference to an alleged forgery.

Accordingly, the Non-Disparagement Claim shall not be dismissed.


### C.   Claims Against Andrews by SPI

SGI is not a party to Andrews' employment agreement. Therefore, any contract claims against Andrews made by SGI shall be dismissed.


### D.   Andrews' Transfer Request

In the pending motion, Andrews sought to transfer this case to the Central District of California.

On May 14, 2013, *Andrews v. SPS*, MJG-13-1419, was transferred to this Court from the Central District of California, by the agreement of Andrews and SPS [Document 16]. In MJG-13-1419, Andrews asserts several employment-related claims against SPS, including retaliation in violation of the Fair Employment and Housing Act and public policy, wrongful termination, breach of contract, failure to pay wages, violation of the Business & Professions Code, etc.  After the hearing on the instant matter, the Court issued a Scheduling Order

[Document 67] coordinating discovery in MJG-13-1419 and the instant case.

In light of Andrews' agreement to the transfer of <u>Andrews v. SPS</u>, MJG-13-1419 to this Court, Andrews is no longer pursuing his transfer request.


    E.  <u>Declaratory Judgment (Count IV)</u>

In Andrews' employment agreement, he agreed that SPS would have a right to set off against any payments due to him under the employment agreement, any damages sustained by virtue of a violation of the Non-Disparagement Provision.

The declaratory judgment may, as a practical matter, be mooted by virtue of the pendency in this Court of the related case, <u>Andrews v. SPS</u>, MJG-13-1419.  The Court will not now dismiss Count IV but shall, after consultation with counsel, take such action as may be appropriate to simplify the proceedings in both cases.

V.   <u>CONCLUSION</u>

For the foregoing reasons:

1. Defendants Sean Turner's and Benjamin Ball's.
   Motion to Dismiss Amended Complaint for Failure
   to State a Claim [Document 52] is DENIED.

2. Defendant James Andrews' Motion to Dismiss for
   Failure to State a Claim and/or, Alternatively,
   to Transfer Under Forum Non Conveniens [Document
   57] is DENIED.

3. This case shall proceed with discovery pursuant
   to existing Scheduling.

SO ORDERED, this <u>Monday, July 22, 2013</u>.

_____/s/_____
        Marvin J. Garbis
    United States District Judge